# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched or identify the person by name and address)* )
)   Case No.  '23  MJ1781
Black Samsung Cellular Phone IMEI: 350121679674895 )
(Target Device 2) )
)

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Please see Attachment A

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

Please see Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841/846, 21 USC 952/960/963, 8 USC 1324, 18 USC 201 | Conspiracy to Distribute Controlled Substances, Conspiracy to Import Controlled Substances, Bringing in Certain Aliens, Bribery |

The application is based on these facts:

See Attached Affidavit

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Prescilla Gonzales*
Applicant's signature

DHS OIG Special Agent Prescilla Gonzales
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by ___telephone___ *(specify reliable electronic means)*.

Date:  May 17, 2023

*Allison H. Goddard*
Judge's signature

City and state: San Diego, CA                Hon. Allison H. Goddard, US Magistrate Judge
*Printed name and title*

# ATTACHMENT A

PROPERTY TO BE SEARCHED

The following property is to be searched:

      b.  Black Samsung Cellular Phone IMEI: 350121679674895
          (**Target Device 2**)

**Target Device 2** is currently in the possession of the Department of Homeland Security, Office of the Inspector General located at 701 B Street, Suite 560, San Diego, California 92101.

# ATTACHMENT B
## ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from Target Device 2 will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, web history, files, metadata, photographs, audio files, videos, and location data, for the period of March 1, 2023, up to and including May 10, 2023:

  a. tending to indicate efforts to possess with the intent to distribute controlled substances and smuggle persons within the United States;

  b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the distribution of and/or the possession with the intent to distribute controlled substances and smuggle persons within the United States;

  c. tending to identify co-conspirators, criminal associates, or others involved in the distribution of and/or the possession with intent to distribute of methamphetamine or other controlled substances and smuggle persons within the United States;

  d. tending to identify travel to or presence at locations involved in the distribution of or possession with intent to distribute controlled substances and smuggle persons within the United States, such as stash houses, residences used to prepare or process controlled substances, load houses, or delivery points;

  e. tending to identify the user of, or persons with control over or access to, Target Device 2; and/or

  f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

  which are evidence of violations of Title 21, United States Code, Sections 841(a)(1), 846, (Distribution of Controlled Substances and Conspiracy to do the same), Title 18, United States Code, Section 201 (Receiving Bribes as a Public Official), and Title 8, United States Code, Section 1324 (Attempted Bringing in of Certain Aliens).

# AFFIDAVIT

I, Special Agent Prescilla Gonzales, being duly sworn, hereby state as follows:

## A.    INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following electronic devices:

    a. Ivory colored Samsung Galaxy S10+ Cellular Phone IMEI: 356022100957012
    (**Target Device 1**)
    b. Black Samsung Cellular Phone IMEI: 350121679674895
    (**Target Device 2**)
    c. Gray Motorola Model V3m Cellular Phone, DEC 05012180191, Hex 32B9DADF
    (**Target Device 3**)

    collectively, the **Target Devices**

as further described in Attachment A, and to seize evidence of crimes, specifically violations of Title 21, United States Code, Sections 841(a)(1), 846, (Distribution of Controlled Substances and Conspiracy to do the same), Title 18, United States Code, Section 201 (Receiving Bribes as a Public Official), and Title 8, United States Code, Section 1324 (Attempted Bringing in of Certain Aliens) as further described in Attachment B. The **Target Devices** were used by Hector Hernandez and is currently in the custody of the Department of Homeland Security, Office of the Inspector General (DHS OIG) located at 701 B Street, Suite 560, San Diego, California 92101.

2. The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Devices**, it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

//
//
//

1

**EXPERIENCE AND TRAINING**

3. I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

4. I am a Special Agent with the DHS OIG and have been so employed since December 2020. During my time with DHS OIG, I have investigated crimes involving public corruption, bribery, fraud, narcotics trafficking, human trafficking, excessive use of force, and violations of civil liberties. Prior to DHS OIG, I was a Special Agent with the United States Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). I am a graduate of the Federal Law Enforcement Training Center (FLETC) Criminal Investigator Training Program (CITP) and the Immigration and Customs Enforcement Special Agent Training (ICESAT) course.

5. As a federal law enforcement officer for approximately 16 years, I have received formal training, as well as extensive on-the-job training, relative to the investigation of federal crimes involving human smuggling, kidnaping/extortion, firearms smuggling, and narcotics smuggling. I have participated in investigations which involved the use of electronic surveillance techniques. I have monitored or overheard numerous calls or meetings between informants or undercover agents, firearms traffickers, drug traffickers and money launderers. I have investigated firearms trafficking, illicit narcotics, controlled substances, money laundering, wire fraud and other crimes that have resulted in arrests, indictments, and convictions.

6. During the course of my duties, I have learned the following information from my personal participation in this investigation and by reading reports prepared by other law enforcement officers. The following does not contain all the information known to me or other federal agents and state and local officers regarding this investigation into the methamphetamine distribution and human smuggling related activities of US Border Patrol

2

Agent Hector HERNANDEZ (BPA HERNANDEZ) but does contain those facts believed to be necessary to establish the requisite probable cause.

3. Based on my training and experience, I am familiar with how traffickers communicate and operate. For example, I am aware that traffickers frequently discuss criminal activity using cellular telephones and often use coded language to obscure conversations about their unlawful activity, because they believe coded language makes it more difficult to identify their conduct. I also know that traffickers change telephones as a means to evade detection by law enforcement. Moreover, I know that traffickers obtain telephones from third parties and or subscribe to them in fictitious names to mask the true identity of the individuals using the telephones. I am also familiar with the typical makeup and operation of gangs and drug trafficking organizations, including the distribution, storage, and transportation of the drugs, the collection of money that represents the proceeds of drug trafficking, the subsequent movement and distribution of proceeds, and other criminal activity. Based upon my training and experience and consultations with law enforcement officers experienced in drug trafficking investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

  a. Traffickers will use cellular telephones because they are mobile, and they have instant access to telephone calls, text, web, and voice messages;

  b. Traffickers will use cellular telephones because they can actively monitor the progress of their illegal cargo while the conveyance is in transit;

  b. Traffickers and their accomplices will use cellular telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations;

  d. Traffickers will use cellular telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo;

  e. Traffickers will use cellular telephones to notify or warn their accomplices of law enforcement activity to include the presence and

3

          posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings; and

    f.    The use of cellular telephones by smugglers tends to generate evidence that is stored on the cellular telephones, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data.

4.    Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a trafficker's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

5.    Based upon my training, experience, and consultations with law enforcement officers experienced in trafficking, and all the facts and opinions set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones of individuals involved in the trafficking of controlled substances may yield evidence:

    a.    tending to indicate efforts to distribute controlled substances;

    b.    tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the distribution of controlled substances;

    c.    tending to identify co-conspirators, criminal associates, or others involved in the distribution of controlled substances;

    d.    tending to identify travel to or presence at locations involved in the distribution of controlled substances, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications.

6. In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of narcotics trafficking investigations, and the opinions stated below are shared by them. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit.

## B.   FACTS SUPPORTING PROBABLE CAUSE

1. In April 2023, based on evidence that BPA HERNANDEZ was engaged in border corruption activities in violation of his duties as a United States Border Patrol Agent, a DHS OIG Undercover Agent (UCA) was introduced to BPA HERNANDEZ.

5. On May 8, 2023, BPA HERNANDEZ spoke with the UCA in a recorded phone call. BPA HERNANDEZ agreed to open a restricted government fence/gate at a coordinated time for the purposes of allowing an undocumented non-citizen (UNC) to enter the United States illegally from Mexico for financial gain. Later that evening, BPA HERNANDEZ spoke with the UCA over recorded telephone calls/text messages to discuss the opening of the restricted government fence. During one such recorded call, BPA HERNANDEZ requested that the UCA "send three" instead of "one." Based on my training and experience, as well as the content and context of the call, I believe that BPA HERNANDEZ told the UCA to send three UNCs instead of one to increase BPA HERNANDEZ's payout, based on a set fee per UNC.

6. Later, on the evening of May 8, 2023, BPA HERNANDEZ, using a U.S. Border Patrol vehicle, drove to an agreed-upon location near the restricted fence/gate. BPA HERNANDEZ used an electronic device that he possessed in his capacity as a U.S. Border Patrol agent to open the gate. BPA HERNANDEZ was told by the UCA that he was doing this to allow a UNC to enter the United States via the open gate in return for

a payment of $5,000 USD to BPA HERNANDEZ, but in fact, no UNC entered the United States.

7. After BPA HERNANDEZ did, in fact, open the fence, BPA HERNANDEZ and the UCA spoke in a recorded phone call. During that call, the UCA told BPA HERNANDEZ that, when they met the next day, they would talk about another "project" through which BPA HERNANDEZ could make more money.

8. On May 9, 2023, BPA HERNANDEZ met with the UCA in a parking lot in the Otay Lakes area of San Diego to receive a $5,000.00 payment for his role in furthering the smuggling of the supposed UNC. During the meeting, BPA HERNANDEZ met with the UCA, received the $5,000 payment, and counted it in the UCA's presence to confirm that it was all there. During that conversation, the UCA told BPA HERNANDEZ that there might be other "work" that BPA HERNANDEZ could do if he wanted to make more money. The UCA told BPA HERNANDEZ, in sum and substance, that the UCA was working with people in Mexico who wanted to import controlled substances and they wanted to use someone older and more experienced that they could trust. During the conversation, BPA HERNANDEZ indicated that he was not sure about going inside the border gate (i.e., between the primary and secondary border fences) to pick up bags of controlled substances because, in sum and substance, that was how someone else got caught in the past. I believe that BPA HERNANDEZ was referring to *United States v. Noe Lopez*, 3:17CR0086-DMS, a case in which BPA Noe Lopez was arrested, convicted, and sentenced for attempting to smuggle methamphetamine and cocaine into the United States. In response, the UCA told BPA HERNANDEZ that the drugs would already be crossed into the United States and hidden somewhere near the border fence for him to pick up. BPA HERNANDEZ said that he was, in fact, willing to do that and would call the UCA later in the evening when BPA HERNANDEZ started his shift and learned what his work assignment was for that night.

9. During the evening of May 9, 2023, BPA HERNANDEZ contacted the UCA and informed him that BPA HERNANDEZ was available to "work" and would

6

contact the UCA at approximately 10:00 p.m. that evening. When BPA HERNANDEZ contacted the UCA, the UCA informed BPA HERNANDEZ that there was a duffel bag loaded with drugs ready for BPA HERNANDEZ to retrieve in a storm drain near the border fence. At approximately 10:37 p.m., BPA HERNANDEZ drove to the location of the duffel bag in his Border Patrol service vehicle and retrieved the duffel bag. Prior to storing the duffel bag in the storm drain, law enforcement placed approximately 10 kilograms of sham methamphetamine, one pound of methamphetamine (actual), and a tracking device into the bag. After BPA HERNANDEZ retrieved the bag, he continued to operate his Border Patrol service vehicle. During that time, the tracking device indicated that the bag was taken to the area of BPA HERNANDEZ's residence. After going back to his residence, BPA HERNANDEZ returned to work in the field, while data from the tracking device indicated it remained at or near his residence.

10. Agents conducted surveillance at BPA HERNANDEZ's residence to monitor the location of the duffel bag. At approximately 7:10 a.m. on May 10, 2023, following the end of his Border Patrol shift, BPA HERNANDEZ returned to his residence driving his personal vehicle and entered his house. At approximately 7:16 a.m., BPA HERNANDEZ was observed exiting the residence carrying a black bag that was similar in size to the duffle bag. BPA HERNANDEZ then drove from the residence to a meeting location in Chula Vista, California. BPA HERNANDEZ and the UCA agreed this was the location where the duffel bag full of drugs would be turned over to the UCA and where BPA HERNANDEZ would receive payment in the amount of $20,000 USD for his transportation and storage of the methamphetamine.

11. At approximately 7:30 a.m., BPA HERNANDEZ arrived at the meeting location carrying the black bag. Upon arriving and meeting with the UCA, BPA HERNANDEZ commented that the bag was heavy. When BPA HERNANDEZ walked to the UCA's vehicle, he showed the UCA that, within the bag he was carrying was the black duffel bag containing the controlled substances. Also, in BPA HERNANDEZ's bag was what appeared to be BPA HERNANDEZ's wallet and ID. BPA HERNANDEZ

then placed the bag containing the duffel bag full of drugs into the UCA's trunk. The UCA said he was going to retrieve BPA HERNANDEZ's payment from inside the UCA's vehicle. At that time, BPA HERNANDEZ was placed under arrest.

7. Agents later opened the duffel bag and confirmed that the approximately 10 kilograms of sham methamphetamine and one pound of methamphetamine (actual) remained inside the bag that BPA HERNANDEZ had retrieved from the storm drain and delivered to the UCA.

8. After BPA HERNANDEZ was arrested, he consented to a search of his residence. The **Target Devices** were found in the master bedroom as follows: **Target Device 1** was found in a drawer under the master bed, **Target Device 2** was found under the television, and **Target Device 3** was found on top of a cabinet above the master bed. Also found in various locations of the master bedroom was approximately $140,000 and approximately 9 grams of a substance that field tested positive for cocaine.

## C. SEARCH METHODOLOGY

*Procedures for Electronically Stored Information*

19. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for

acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

20. Following the issuance of this warrant, I will collect the **Target Devices** and subject them to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

21. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

### D.   PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

22. Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

//
//
//
//
//
//
//

### E. CONCLUSION

23. Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the **Target Devices** will yield evidence of HERNANDEZ's violations of Title 21, United States Code, Sections 841(a)(1), 846, (Distribution of Controlled Substances and Conspiracy to do the same), Title 18, United States Code, Section 201 (Receiving Bribes as a Public Official), and Title 8, United States Code, Section 1324 (Attempted Bringing in of Certain Aliens). Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the item described in Attachment A, and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

*Prescilla Gonzales*
Special Agent Prescilla Gonzales
Office of Inspector General
Department of Homeland Security

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this __17th__ day of May 2023.

*Allison H. Goddard*
HONORABLE ALLISON H. GODDARD
UNITED STATES MAGISTRATE JUDGE

10